**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: September 30 2019**

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 17-53013 |
| | ) | |
| Eno Iftiu, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 18-05024 |
| | ) | |
| Torono Lowery and | ) | Judge John P. Gustafson |
| Niles Froyo, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Eno Iftiu, | ) | |
| | ) | |
| Defendant. | | |

### MEMORANDUM OF DECISION AND ORDER

This Adversary Proceeding is before the court on Plaintiffs Torono Lowery and Niles Froyo, LLC's[1] ("Plaintiffs") Complaint against Defendant-Debtor Eno Iftiu ("Defendant-

---

1/ Plaintiff Niles Froyo, LLC is an entity created and wholly owned by Plaintiff Torono Lowery.

Debtor"). In their Complaint, Plaintiffs[2] sought a finding that Defendant-Debtor owes them in excess of $200,000.00 as a debt related to a transfer of a frozen yogurt business that allegedly violated the Ohio Business Opportunity Purchasers Protection Act ("OBOPPA" or the "Act"), and a determination that said $200,000.00 debt is nondischargeable under 11 U.S.C. §§523(a)(2)(A), (a)(4), and (a)(6).[3] This proceeding is now before the court for decision after a trial was held on March 6 and 7, 2019.[4] Per the court's request, both Plaintiffs and Defendant-Debtor filed post-trial briefs. [Doc. #30; Case No. 18-05023, Doc. #24].[5]

This Adversary Proceeding was transferred to this Western Division court on December 3, 2018 from its Eastern Division counterpart. [Doc. #18]. The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that bankruptcy courts may hear and decide. 28 U.S.C. §157(b)(1) and (b)(2)(I). With regard to Plaintiffs' OBOPPA claim, the parties orally consented to this court's jurisdiction over the claims in this case at the trial held on March 6 and 7, 2019.

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined all the submitted materials, weighed the credibility of witnesses, considered all of the admitted evidence,[6] and reviewed the entire record

---

2/ Though Plaintiff Torono Lowery's wife, Heather Lowery, is not a named plaintiff in this case, the court will refer to both as Plaintiffs throughout this opinion for ease of reference.

3/ Despite outlining claims under §523(a)(4) and (a)(6) in their Complaint, Plaintiffs' post-trial brief argues solely under §523(a)(2)(A). Because the court finds that Plaintiffs prevail on their §523(a)(2)(A) claim, the court will not address §523(a)(4) and (a)(6).

4/ The parties stipulated to holding an administratively consolidated trial at which both Plaintiffs and the plaintiffs in Case No. 18-05023 participated. For purposes of this Memorandum of Decision, the court will only refer to material relevant to Plaintiffs' claims against Defendant-Debtor.

5/ Defendant-Debtor appears to have filed his post-trial brief only in Case No. 18-5023. However, "[m]atters of docket control…are within the sound discretion of the [trial] court," *Eng'g & Mfg. Servs., LLC v. Ashton*, 387 Fed.Appx. 575, 582 (6th Cir. 2010)(citing *Jones v. Northcoast Behavioral Healthcare Sys.*, 84 Fed.Appx. 597, 599 (6th Cir. 2003); *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996)), and the court will utilize Defendant-Debtor's briefing in this case despite any procedural defects.

6/ Plaintiffs' admitted exhibits are referred to as [Pl. Ex. __] and Defendant-Debtor's admitted exhibits via [Def. Ex. __].

2

in the case. Based upon that review, and for the reasons discussed below, the court will decline to decide Plaintiffs' OBOPPA claim and will dismiss it without prejudice because it raises novel issues of Ohio franchise law that are best resolved by Ohio courts.[7] *See*, 28 U.S.C. §§1334(c)(1). However, the court finds that any debt owed to Plaintiffs by Defendant-Debtor[8] arising out of the disputed Niles frozen yogurt store transaction is nondischargeable under 11 U.S.C. §523(a)(2)(A) because Defendant-Debtor made numerous fraudulent misrepresentations and omissions incident to that transaction.

## FINDINGS OF FACT

Heather Lowery, the wife of Plaintiff Torono Lowery, first began discussing a frozen yogurt business deal with Defendant-Debtor Eno Iftiu at a family birthday party in July of 2015. Defendant-Debtor, an individual with experience running frozen yogurt stores under the trade name "#Froyo," is married to Heather Lowery's cousin, Brandi Iftiu. Despite having no previous experience with running a business, Plaintiff Torono Lowery and Heather Lowery expressed an interest in purchasing a frozen yogurt store from Defendant-Debtor, who represented that he could get Plaintiffs a good deal because of his business relationship with the owner of various Menchies frozen yogurt stores. Defendant-Debtor represented that he was purchasing Menchies frozen yogurt stores from Stark Enterprises and could sell one of those stores to Heather Lowery and her

---

7/ The Sixth Circuit Court of Appeals described the decisional duties of bankruptcy courts in the nondischargeability context as follows:

> Although we have held that a bankruptcy court *may* enter final judgment on the amount of a nondischargeable claim, *In re Hart,* 564 Fed.Appx. 773, 776 (6th Cir.2014), we have never held that it must do so. Bankruptcy courts sit in equity. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Courts of equity with jurisdiction over the parties to a controversy generally "decide all matters in dispute and decree complete relief," *Alexander v. Hillman,* 296 U.S. 222, 242, 56 S.Ct. 204, 80 L.Ed. 192 (1935)—even matters that could also be decided by courts of law, *Porter v. Warner Holding Co.,* 328 U.S. 395, 399, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). So long as it is exercising that power within the bounds of the Bankruptcy Code (and the Constitution, *Stern v. Marshall,* 564 U.S. 462, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011)), a bankruptcy court may answer the nondischargeability question without deciding the value of the claim. *See* 11 U.S.C. § 105(a); *In re Granger Garage, Inc.,* 921 F.2d 74, 77 (6th Cir.1990).

*Leonard v. RDLG, LLC* (*In re Leonard*), 644 Fed.Appx. 612, 620 (6th Cir. March 28, 2016). The court will follow *Leonard* by answering Plaintiffs' nondischargeability question without deciding the amount of debt owed to them by Defendant-Debtor.

8/ Because the court declines to decide Plaintiffs' OBOPPA claim, and Plaintiffs have not raised any other independent claims for damages, the court is unable to set or determine the amount of the debt owed Plaintiffs by Defendant-Debtor in connection with the Niles frozen yogurt store transaction. The liquidation of the Plaintiffs' claim for damages may be pursued in state court.

3

husband. Two Menchies locations, one in Niles, Ohio and one in Boardman, Ohio, were the focus of the discussion between Defendant-Debtor and Heather Lowery.

Later in July of 2015, the Lowerys and Defendant-Debtor discussed the details of their potential deal while meeting at various restaurants around Cleveland and Youngstown. Defendant-Debtor reiterated that he was in the process of purchasing various Menchies stores and rebranding them as #Froyo stores, one of which Plaintiffs and Heather Lowery could buy from Defendant-Debtor and operate under the #Froyo tradename. Defendant-Debtor represented that the Niles frozen yogurt location was particularly profitable, that he had seen "the numbers" for the Niles location, and that it performed similarly to his #Froyo stores located in the Columbus, Ohio area.

At the first meeting, Defendant-Debtor informed the Lowerys that he was unsure how much it would cost Plaintiffs to purchase the Niles location from him. At a meeting at a Niles area Panera Bread later in July of 2015, Defendant-Debtor provided Plaintiffs with "the numbers" for the Niles location that he had obtained from Stark Enterprises. [Pl. Ex. 18]. Defendant-Debtor presented that document, a summary of the 2014 sales figures and 2015 sales projections for the Niles Menchies location, as an estimate of what Plaintiffs could earn if they were to purchase the Niles location and operate it under the #Froyo tradename. Plaintiffs regarded the provided projections as part of an exciting prospect, and elected to pursue the business opportunity with Defendant-Debtor. Defendant-Debtor also represented that when he rebranded his Columbus stores from Menchies to #Froyo, he did not have a problem and that, were Plaintiffs to purchase and operate the Niles location similarly, they would not have a problem with the brand switching either. At no point were Plaintiffs advised by Defendant-Debtor of the risks associated with a branding change.

At a meeting in a Brecksville, Ohio Bob Evans restaurant in August of 2015, the parties discussed how much Plaintiffs would pay to purchase the Niles location from Defendant-Debtor. Defendant-Debtor informed Plaintiffs that he was currently in negotiations with Stark Enterprises regarding his bulk deal purchase of Menchies locations, that another party was interested in the Niles location, and that Plaintiffs would have to pay a purchase price of $135,000.00. Heather Lowery testified that Defendant-Debtor represented to Plaintiffs that he would not be making any money from his transaction with Plaintiffs because Plaintiffs were family, and that Plaintiffs needed to act quickly if they wanted to take advantage of the deal. While Plaintiffs considered Defendant-Debtor a member of their family, Defendant-Debtor testified at trial that he regarded

4

the Niles location transaction as little more than a transaction between unrelated parties.

During a meeting in mid-August of 2015 at which Plaintiffs were introduced to Defendant-Debtor's attorney, Ashraf Abbas ("Mr. Abbas"), Plaintiffs and Defendant-Debtor came to an agreement and moved forward on the Niles yogurt store transaction with the understanding that Mr. Abbas would assist with the creation of a limited liability company for Plaintiffs in order to effectuate the deal.

On August 27, 2015, Plaintiffs and Defendant-Debtor, through their respective LLCs,[9] executed the following documents ("Documents") to effectuate Plaintiffs' purchase of the Niles frozen yogurt store from Defendant-Debtor: 1) a Purchase Agreement ("Purchase Agreement") outlining Plaintiffs payment of $135,000.00 in exchange for the Niles frozen yogurt store, including the equipment, fixtures, furnishings, and the right to occupy the Niles store's premises [Pl. Ex. 5]; 2) a cognovit Promissory Note ("Promissory Note") detailing Plaintiffs' responsibility to make monthly payments to Defendant-Debtor totaling $55,000.00, the balance of the purchase price that remained after Plaintiffs made an initial down payment of $80,000.00 [Pl. Ex. 6]; and 3) a Joint Venture Agreement stating that, in exchange for Plaintiffs' payment of $80,000.00, Plaintiffs' promise to reimburse Defendant-Debtor's legal fees arising out of the joint venture, and promise to pay monthly royalties as a percentage of the Niles store's gross sales, Plaintiffs would obtain from Defendant-Debtor the right to operate the Niles frozen yogurt business under the #Froyo tradename. [Pl. Ex. 7].

As of August 27, 2015, Defendant-Debtor Eno Iftiu had not yet purchased the assets he was selling. The transfer from the Stark Enterprises-owned LLC, Yogurt Treats Niles, LLC, did not occur until September 19, 2015. [Pl. Exs. 14, 15]. Moreover, there is no evidence that Defendant-Debtor Eno Iftiu ever transferred the assets from his name to his entity, EVI Holdings, LLC, that purportedly transferred the Niles frozen yogurt store's assets to Plaintiffs.

The Joint Venture Agreement contained an integration clause, stating that "[t]his Agreement constitutes the entire understanding of the Parties,…." [Pl. Ex. 7, p. 6]. Notably, Defendant-Debtor never provided Plaintiffs with any disclosures regarding his financial condition, the financial condition of EVI Holdings, LLC, or the financial condition of his other frozen yogurt

---

9/ Plaintiffs utilized Niles Froyo, LLC and Defendant-Debtor utilized EVI Holdings, LLC. Defendant-Debtor is the sole owner of EVI Holdings, LLC. However, EVI Holdings, LLC had no ownership interest in the assets of the Niles frozen yogurt business at the time the Documents were executed and the initial down payment was made.

locations. At trial, Defendant-Debtor revealed that, as of August 27, 2015, most of his prior frozen yogurt stores had closed[10] and that, by the time Plaintiffs closed the Niles #Froyo location, it was the last remaining frozen yogurt operation with which Defendant-Debtor had been involved.

Plaintiffs believed that they were entering into a franchise relationship with Defendant-Debtor, and knew that he had been advertising franchise opportunities via his hashtagfroyo.com website. [Pl. Ex. 13]. Further, at one of the meetings of the parties, Defendant-Debtor presented Plaintiffs with a document that detailed various franchise fee arrangements in the frozen yogurt industry, and at the bottom, it stated "Our Franchise Fee…6% After 6 months-1 Year," and "Will not start taking out fee until YOU are taking out money." [Pl. Ex. 18.2]. In early 2016, Defendant-Debtor also provided Plaintiffs with a document entitled "#FROYO Premium Frozen Yogurt Operations Manual" that included among its instructions the following statement: "This Operations Manual is intended to explain the day-to-day operations of your very own #FROYO franchise." [Pl. Ex. 12, p. 3].

As part of the sale, Defendant-Debtor was to provide Plaintiffs with assistance in running the Niles frozen yogurt store. He did inform Plaintiffs where they could buy the necessary supplies, and that they could purchase #Froyo signage through him and his connections. Defendant-Debtor represented to Plaintiffs that they would likely get a good deal on frozen yogurt supplies if they purchased them from the same supplier he used for his other #Froyo stores. Although Plaintiffs operated the Niles frozen yogurt store until August of 2017, Defendant-Debtor testified that he was last in the Niles store sometime in 2016.

In terms of the representations made by Defendant-Debtor in the Purchase Agreement, Eno Iftiu warranted that he, through his LLC, was the owner of the equipment, furnishings and other property located at the Niles frozen yogurt store [Pl. Ex. 5, p. 1] and that the assets described in the purchase agreement were sold free and clear of all third-party liabilities, obligations, liens, and encumbrances. [*Id.*]. Plaintiffs would later discover that neither Defendant-Debtor nor his LLC

---

10/ Specifically, Defendant-Debtor revealed that both of his stores in the Columbus area, his first frozen yogurt ventures, had closed because they were unprofitable and that he was sued for fraud by his former business partner's mother for a loan she provided for the initial build-out of one of those Columbus locations. Defendant-Debtor also testified that the #Froyo location he opened near the University of Akron had never been profitable and that, as of the date of his bankruptcy filing, he still owed debts related to that location's closure. As for Defendant-Debtor's smoothie operation in Cuyahoga Falls, he averred that it had been profitable, but that he had sold it less than two years after opening because he no longer wanted to run his own business.

6

18-05024-jpg    Doc 31    FILED 09/30/19    ENTERED 09/30/19 16:15:16    Page 6 of 18

owned the Niles frozen yogurt store's assets at the time the parties executed the Purchase Agreement, and that the assets described in the Purchase Agreement were actually encumbered by a perfected security interest held by a Stark Enterprises-owned entity, Yogurt Treats Niles, LLC.

Plaintiffs paid Defendant-Debtor $80,000.00 on September 2, 2015. [Pl. Ex. 8]. Although they expected to open the Niles store within a few weeks of making the down payment, Plaintiffs were unable to obtain possession of and open the Niles store until December 12, 2015. Further, despite paying Defendant-Debtor $7,695.00 on October 2, 2015 for signage and other #Froyo expenses [Pl. Ex. 18.3], Plaintiffs did not obtain #Froyo signage until February of 2016. Between opening on December 12, 2015 and obtaining signage in February of 2016, the Niles frozen yogurt store operated beneath a temporary banner. Heather Lowery testified that she learned how to operate the frozen yogurt store from the employees that remained at the Niles store after their transaction with Defendant-Debtor.

Sales at the Niles frozen yogurt store were not in line with the Stark Enterprises figures Defendant-Debtor had provided. Instead of generating annual sales of $260,000.00, the Niles frozen yogurt store only generated a total of $250,945.68 in sales during the 21 months Plaintiffs operated the store. Plaintiffs kept the Niles store running by accepting cash gifts from relatives and by utilizing their personal credit. The Niles frozen yogurt store closed in August of 2017. At that time, Plaintiffs had paid Defendant-Debtor a total of $95,535.32, including the $80,000.00 down payment, Plaintiffs' two payments under the Promissory Note, and $7,695.00 for signage and other costs.

Defendant-Debtor filed the underlying Chapter 7 case on December 19, 2017. [Case No. 17-53013, Doc. #1]. On Schedule E/F, Defendant-Debtor listed Torono Lowery as being owed an unsecured debt in an "Unknown" amount. [*Id.*, p. 25].

Plaintiffs filed a Complaint against Defendant-Debtor on April 16, 2018, initiating this adversary proceeding. [Doc. #1]. At the trial held on March 6 and 7, 2019, the parties presented testimony from: 1) Heather and Torono Lowery, the couple that attempted to operate the Frozen Yogurt Business after they entered into the Niles frozen yogurt store transaction with Defendant-Debtor; 2) Steve Coven ("Mr. Coven"), representative of Stark Enterprises, the owner of Plaintiffs; 3) Defendant-Debtor Eno Iftiu; and 4) Stanley Dub, an attorney who assisted the Lowerys with the filing of a Trumbull County lawsuit against Defendant-Debtor. At the close of trial on March 7, 2019, Plaintiffs' Exhibits 1, 5 through 14, 14.1, 15, 16, 18, 18.1, 18.2, 18.3, 19 through 23 and

Defendant-Debtor's Exhibits A through K, M, and N were admitted into evidence without objection.

## LAW AND ANALYSIS

### I. The Ohio Business Opportunity Purchaser's Protection Act

Plaintiffs allege that the Joint Venture Agreement stands alone as an independent agreement that qualifies as a "business opportunity plan" governed by OBOPPA. Plaintiffs further allege that Defendant-Debtor's misrepresentations and failure to follow OBOPPA's disclosure requirements violate the act and entitle them to damages. Upon review of the statute itself and how Ohio courts have applied OBOPPA, the court declines to decide this novel issue of Ohio franchise law. Thus, the court will dismiss Plaintiffs' OBOPPA claim without prejudice.

Because OBOPPA is an Ohio statute, and the Joint Venture Agreement/Purchase Agreements are contracts governed by Ohio law. [Pl. Ex. 7, p. 5; Pl. E. 5, p. 3]. In interpreting Ohio law, this bankruptcy court must apply the "law of the state's highest court." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995); *see also*, *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

However, the Ohio Supreme Court has not had the opportunity to interpret OBOPPA, and if "the state's highest court has not decided the applicable law, then the federal court [should] ascertain the state law from 'all relevant data.'" *Garden City*, 55 F.3d at 1130 (citations omitted); *Baumgart v. Alam (In re Alam)*, 359 B.R. 142, 147 (6th Cir. BAP 2006); *Owensby v. City of Cincinnati*, 385 F.Supp.2d 626, 631 (S.D. Ohio 2004)(listing what may be analyzed as "relevant data", including lower state court opinions, federal court decisions, etc.). In *Garden City*, the Sixth Circuit Court of Appeals quoted the following passage on "relevant data":

> [W]e are mindful that an intermediate appellate court's judgment that announces a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Garden City*, 55 F.3d at 1130 (quotation omitted).

Ohio courts have stated, "[w]hen the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no need for [a] court to apply rules of statutory

interpretation. *State v. Kreischer*, 109 Ohio St.3d 391, 394, 848 N.E.2d 496, 498 (Ohio 2006)(citing *State v. Muncie*, 91 Ohio St.3d 440, 447, 746 N.E.2d 1092 (Ohio 2001); *Symmes Twp. Bd. Of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (Ohio 2000)). In other words, "[s]tatutory interpretation involves an examination of the words used by the legislature in a statute, and when the General Assembly has plainly and unambiguously conveyed its legislative intent, there is nothing for a court to interpret or construe, and there, the court applies the law as written." *Id.* at 394, 848 N.E.2d at 498.

Under Ohio law, the purpose of contract interpretation is to give effect to the intent of the parties. *Sunoco Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 404, 953 N.E.2d 285, 292 (Ohio 2011). In pursuit of that purpose, courts begin with the plain meaning of the contract's terms and look to the contract as a whole. *Id.* As summarized by the Ohio Supreme Court in *Sunoco Inc.*:

> When confronted with an issue of contract interpretation, [the court's] role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, [the court] will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.

*Id.* Importantly, when a contract is silent as to a particular condition or term, courts look first to extrinsic evidence, and then to secondary rules of interpretation, in interpreting it. *See*, *Cadle v. D'Amico*, 66 N.E.3d 1184, 1189 (Ohio Ct. App. 2016)("Construing a contract against the drafter is a secondary rule of contract construction, and is applicable when the primary rules of contract construction, i.e. plain language of the document and extrinsic evidence, in that order, fail to clarify the meaning of the contract.").

The Ohio Business Opportunity Purchasers Protection Act, codified at O.R.C. §1334, et seq., regulates the sale of "business opportunity plans." OBOPPA defines a "business opportunity plan" as "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all of the following conditions:

(1) The goods or services are supplied by the seller, a third person with whom the purchaser is required or advised to do business by the seller, or an affiliated person.

> (2) The purchaser is required to make an initial payment[11] greater than five hundred dollars, but less than one hundred thousand dollars, to the seller or an affiliated person to begin or maintain the business opportunity plan.
>
> (3) The seller makes any of the following representations:…
>
>> (c) That the purchaser can earn a profit in excess of the initial payment;
>>
>> (d) That there is a market for the goods or services."

O.R.C. 1334.01(D).[12]

Upon review of the Ohio cases in which OBOPPA has been interpreted, the court finds that none have addressed the precise issue before the court. Specifically, Plaintiffs argue that the Joint Venture Agreement should be regarded as a solitary agreement and that, accordingly, it qualifies as "business opportunity plan" under OBOPPA because the "initial payment" required under the Joint Venture Agreement is under $100,000.00. Plaintiffs further argue that the Joint Venture Agreement should be construed as separate from the Purchase Agreement because the former implicates Plaintiffs purchased right to operate under the #Froyo tradename, while the latter implicates Defendant-Debtor's sale of assets and a leasehold right to occupy the Niles frozen yogurt store location. Defendant-Debtor counters with the argument that the Joint Venture Agreement must be read as a component of the deal the parties agreed to when they executed the Purchase Agreement, Promissory Note, and Joint Venture Agreement, all on August 27, 2015.

Put simply, Ohio courts have not yet decided the extent to which an agreement that conveys both franchise rights and all of the assets necessary for a business to operate falls within OBOPPA's ambit. Numerous Ohio courts have held that, where multiple documents refer to one another and constitute components of a comprehensive agreement, any OBOPPA claim fails if the initial payment contemplated by the comprehensive agreement exceeds the statutory threshold.

---

11/ The statute defines "initial payment" as:

> [T]he total amount a purchaser is obligated to pay prior to or during the first six months after commencing operation of the business opportunity plan. If an agreement sets forth a specific total sale price for purchase of a business opportunity plan, which is to be paid in one or more installments, "initial payment" means the entire total sale price. "Initial payment" also includes the full amount of any promissory note given by a purchaser, or an affiliated person, to the seller, or an affiliated person, prior to or during the first six months after commencing operation of the business opportunity plan….

O.R.C. 1334.01(G).

12/ O.R.C. §1334.01(D) lists three other qualifying seller representations not relevant here.

18-05024-jpg    Doc 31    FILED 09/30/19    ENTERED 09/30/19 16:15:16    Page 10 of 18

*See*, *Watch What Develops Franchise Concepts, Inc. v. Custom 1-Hour Photo, Inc.*, 1990 WL 163950, 1990 Ohio App. LEXIS 4658 (Ohio Ct. App. October 17, 1990)(finding that OBOPPA did not apply where two separate documents, which incorporated each other by reference, described an initial payment in excess of OBOPPA's threshold); *Andrew v. Power Mktg. Direct*, 978 N.E.2d 974 (Ohio Ct. App. 2012)(finding that initial payment comprised of license fee and inventory purchase excepted agreement from OBOPPA); *GJ Food Serv. One v. Shepherd*, 1998 WL 195698, 1998 Ohio App. LEXIS 1696 (Ohio Ct. App. April 24, 1998)(dismissing OBOPPA claim where three franchise agreements were components of comprehensive agreement and combined initial payment under all three exceeded OBOPPA's initial payment limit).

However, none of those cases dealt with the issue before this court, namely whether a hybrid sale of both franchise rights and the whole of a store's assets, including its leasehold interest, requires that all agreements that are part of that sale be read together for purposes of OBOPPA. Further, Plaintiffs point to the legislative purpose of OBOPPA as a basis for arguing that construing the Purchase Agreement and Joint Venture Agreement as components of a single agreement would run contrary to OBOPPA's goal of preventing misleading sales of franchise opportunities. Nevertheless, the above cited Ohio cases never reached the issue of interpreting OBOPPA's purpose, and the plain language of the statute arguably runs contrary to Plaintiffs' argument that agreements incident to the sale of a potentially qualifying "business opportunity plan" should be read separately.

Plaintiffs cite to *Bell v. Nat'l Safety Assocs.*, 1993 U.S. Dist. LEXIS 21302 (S.D. Ohio October 1, 1993) for the proposition that whether separate agreements should be read together for purposes of an "initial payment" analysis under OBOPPA is a factual matter to be resolved at trial. The *Bell* case is inapposite here because it dealt with a set of facts similar to those dealt with in other state court cases that have interpreted OBOPPA. In *Bell*, the court was asked to decide whether a distributorship agreement that dealt solely with the plaintiff's right to sell branded air and water filtration systems fell within OBOPPA's scope. 1993 U.S. Dist. LEXIS 21302 at *1-2. Thus, *Bell* does not provide any guidance in terms of whether an agreement for the sale of both franchise rights and all of a store's assets requires that a court read multiple documents together for purposes of OBOPPA's "initial payment" threshold.

Accordingly, because Plaintiffs' OBOPPA claim raises a novel issue of how to apply an Ohio statute to a set of facts not yet encountered by an Ohio court, the court declines to decide

Plaintiffs' OBOPPA claim and dismisses it without prejudice.

## II. Exception to Discharge under 11 U.S.C. §523

Plaintiffs seek a determination that the debt owed them by Defendant-Debtor in connection with the Niles frozen yogurt store transaction is nondischargeable under 11 U.S.C. §523(a)(2)(A). Exceptions to discharge are strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998); *In re Livingston,* 372 F. App'x 613, 618 (6th Cir. 2010). Additionally, "[t]he objecting creditor bears the burden of proof by a preponderance of the evidence to establish the debt is of the type excepted from discharge." *Brann v. Oxford* (*In re Oxford*), 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010)(citing *In re Molino*, 225 B.R. 904, 907 (6th Cir. BAP 1998)); *see also*, *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

### IIA. 11 U.S.C. §523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services...to the extent obtained by[13] – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." In order to except a debt from discharge under this section, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

Under §523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Baker v. Wentland* (*In re Wentland*), 410 B.R. 585, 594 (Bankr. N.D. Ohio 2009)(quoting *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)). "False pretenses are distinguishable from false representations in that 'a false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an express representation.'" *Coughlin Chevrolet, Inc. v. Thompson* (*In re Thompson*), 458 B.R. 409, 421 (Bankr. S.D. Ohio 2011)(quoting *Goldberg Securities, Inc. v. Scarlata* (*In re Scarlata*), 127 B.R. 1004, 1009 (N.D.

---

13/ Enacted in 1984, the Bankruptcy Amendments and Federal Judgeship Act ("BAFJA") added the phrase "…to the extent obtained by…." to §523(a)(2).

18-05024-jpg    Doc 31    FILED 09/30/19    ENTERED 09/30/19 16:15:16    Page 12 of 18

Ill. 1991)); *see also*, *Wentland*, 410 B.R. at 594.

In addition to "false representation" and "false pretenses," the Supreme Court has held that §523(a)(2)(A) also provides a cause of action for "actual fraud," or fraud that "[does] not require a misrepresentation from a debtor to a creditor." *Husky Int'l Elecs., Inc. v. Ritz*, ___U.S.___, 136 S.Ct. 1581, 1587, 194 L.Ed.2d 655 (2016); *see also, Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001). "'Actual fraud' includes fraudulent transfers and "fraudulent conduct" that deals in "acts of concealment and hindrance." *Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1587.

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained through review of the totality of the circumstances. *Rembert,* 141 F.3d at 281-82; *see also*, *Oxford*, 440 B.R. at 777. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," given that direct, express proof of intent is rarely available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (6th Cir. BAP 1999) (quoting *Hunter v. Sowers* (*In re Sowers*), 229 B.R. 151, 159 (Bankr. N.D. Ohio 1998)); *Oliver v. Zimmerman* (*In re Zimmerman*), 567 B.R. 521, 526 (Bankr. N.D. Ohio 2017); *Risk v. Hunter* (*In re Hunter*), 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015); *Chase Bank v. Brumbaugh* (*In re Brumbaugh*), 383 B.R. 907, 912 (Bankr. N.D. Ohio 2007); *EDM Machine Sales v. Harrison* (*In re Harrison*), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003); *Oxford*, 440 B.R. at 777. "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Zimmerman*, 567 B.R. at 526; *Wentland*, 410 B.R. at 594; *Buckeye Retirement Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 427 (Bankr. S.D. Ohio 2008).

Relevant here, only "the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt." *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998). Accordingly, the focus of a §523(a)(2)(A) analysis is on whether the debt at issue arises from a fraudulent act or actions. *See*, *Id.*; *see also*, *Ghadimi v. Ashai* (*In re Ashai*), 211 F.Supp.3d 1215, 1237-38 (C.D. Cal. 2016)(collecting cases holding that §523(a)(2)'s "to the extent obtained by" language precludes a finding of nondischargeability where the fraudulent misrepresentation occurred after the debt arose); *Weems & Stephens Equine Hosp., Inc. v. Hancz* (*In re Hancz*), 2010 WL 3909959 at *3, 2010 Bankr. LEXIS 3473 at **7-10 (Bankr. N.D. Ill. September 30, 2010)(finding that a fraudulent statement made after the debt at issue arose could not support a finding of nondischargeability under §523(a)(2)(A)).

13

**IIB. The Debt Owed Plaintiffs by Defendant-Debtor is Nondischargeable Under §523(a)(2)(A)**

In applying §523(a)(2)(A) to the facts established at trial, the court finds that Plaintiffs have met their burden as to all four elements. Accordingly, the court finds that Defendant-Debtor Eno Iftiu's various misrepresentations and omissions surrounding the Niles frozen yogurt store transaction warrant a determination that his debt owed to Plaintiffs, in an amount not yet decided, is nondischargeable under §523(a)(2)(A).

Defendant-Debtor obtained property through material false representations and false pretenses, satisfying the first §523(a)(2)(A) element. The court finds that Defendant-Debtor's conduct as he induced Plaintiffs into purchasing the Niles frozen yogurt store included numerous misrepresentations and omissions. First, at the time of the Niles frozen yogurt store transfer, and the Plaintiffs' payment to Defendant-Debtor, Defendant-Debtor had nothing to transfer. Defendant-Debtor had not yet purchased the Niles frozen yogurt store from the Stark Enterprises-owned entity. Yet, he purported to sell the Niles location through an LLC, EVI Holdings, despite there being no evidence that the assets were ever transferred to that entity, and Defendant-Debtor misrepresented that there were no liens on the personal property purportedly being transferred.

Second, Defendant-Debtor obtained the benefit of $87,695.00 in the form of Plaintiffs' $80,000.00 down payment and the $7,695.00 for miscellaneous costs and signage that took months to arrive. As established by the parties' testimony at trial, Defendant-Debtor presented Plaintiffs with highly misleading sales projections that omitted the financial risks inherent to operating a frozen yogurt store under a relatively unknown tradename. Defendant-Debtor also failed to disclose a host of information pertinent to Plaintiffs' decision to purchase the Niles frozen yogurt store, including Defendant-Debtor's personal financial condition and the financial condition of his prior frozen yogurt stores.

Additionally, the record reflects that Defendant-Debtor's numerous misrepresentations and omissions were material with regard to the Niles frozen yogurt store deal. Had Defendant-Debtor disclosed his actual financial interest in the Niles frozen yogurt store, he would have revealed to Plaintiffs that neither he nor his LLC owned the Niles location on August 27, 2015, that he was still in talks with Stark Enterprises regarding his purchase of that location, and that Stark Enterprises would receive a perfected security interest [Pl. Ex. 16] in the assets Defendant-Debtor was representing as free and clear of all liens and encumbrances.

Heather Lowery also credibly testified that the Lowerys believed the Niles frozen yogurt

store deal to be an exciting opportunity, an impression Defendant-Debtor encouraged by providing Plaintiffs with sales figures for the Menchies store that previously operated at the Niles location, rather than for any of the #Froyo locations that he had actually operated.

In sum, the court finds that the first §523(a)(2)(A) element has been met here because Defendant-Debtor obtained a benefit through material misrepresentations and omissions that he knew were false or highly misleading as he made them.

As for the second element, which looks to the Debtor's intent, the court finds that the evidence presented at trial established that Defendant-Debtor intended to deceive Plaintiffs throughout the Niles frozen yogurt store transaction. Defendant-Debtor provided Plaintiffs with a host of false or highly misleading information, from representing that he owned the Niles store he was purporting to sell on August 27, 2015 to providing Plaintiffs with financial projections for a store that operated under a well-known brand unrelated to the #Froyo tradename that was to be used by Plaintiffs. Further, Heather Lowery credibly testified that Defendant-Debtor represented that he was not charging Plaintiffs any premium, when, as revealed at trial, he had marked up the purchase of the Niles location from $75,000.00 to $135,000.00. These acts demonstrate a purposeful course of fraudulent conduct on his part, rather than one of inadvertence or carelessness. *See*, *Hamo,* 233 B.R. at 724. In other words, the record reflects that Defendant-Debtor acted deliberately when he presented Plaintiffs with a false picture of what he owned and what they could expect when they paid to purchase the Niles frozen yogurt store.

Thus, the court finds that Plaintiffs have met their burden under the second element of §523(a)(2)(A).

The evidence presented at trial also showed that Plaintiffs were justified in relying on Defendant-Debtor's numerous misrepresentations and omissions, satisfying the third §523(a)(2)(A) element. Defendant-Debtor had prior experience in operating frozen yogurt businesses, and Plaintiffs not only had no experience in running a business at all, neither Torono nor Heather Lowery had ever taken even a single business class. It is true that Plaintiffs did not consult with their own attorney[14] at any point during the Niles frozen yogurt store transaction. However, because they considered him family, Plaintiffs had no reason to suspect that Defendant-Debtor would defraud them. Accordingly, the court finds that the third §523(a)(2)(A) element is

---

14/ On Defendant-Debtor's recommendation, Plaintiffs acted through Eno Iftiu's attorney, Mr. Abbas, in creating their LLC.

met here because Plaintiffs, inexperienced in running a business, were justified in relying on Defendant-Debtor's misrepresentations and omissions. *See*, *In re Oster*, 474 Fed.Appx. 422, 425 (6th Cir. March 26, 2012)("'justifiable reliance,' the standard for §523(a)(2)(A) claims.").

Lastly, in analyzing the fourth §523(a)(2)(A) element, which looks to whether Plaintiffs' reliance on Defendant-Debtor's misrepresentations was the proximate cause of their loss, the court finds that Plaintiffs have met their burden. Heather Lowery credibly testified that practically everything about the Niles frozen yogurt store deal appeared to be positive and an indication that they should go through with the deal. The court need not decide whether Plaintiffs would have gone through with the Niles frozen yogurt store deal at all had they known the truth in order to find that, at a minimum, the deal likely would have looked very different, particularly in terms of finances. Not only would Plaintiffs have known that they would have needed to consult with Stark Enterprises, the entity that actually owned the Niles location when the parties executed the Purchase Agreement and Joint Venture Agreement, Plaintiffs would have known that Defendant-Debtor was charging them a $60,000.00 premium and that his history of running frozen yogurt stores was less than successful.

Although the court is not determining the specific amount of damages suffered by Plaintiffs, it does decide that the as-of-yet undetermined harm suffered by Plaintiffs in connection with the Niles frozen yogurt store transaction were caused by Defendant-Debtor's fraudulent conduct.

Defendant-Debtor argues that Plaintiffs cannot establish that his misrepresentations caused the damages Plaintiffs allege. Because the Niles frozen yogurt business was unprofitable before Plaintiffs and Defendant-Debtor entered into the Purchase Agreement and Joint Venture Agreement, Defendant-Debtor argues, Plaintiffs cannot link the harm they suffered with Defendant-Debtor's various misrepresentations and omissions. Essentially, Defendant-Debtor argues that the Niles frozen yogurt store's failure was inevitable and not a result of his misrepresentations and omissions.

First, there was no credible evidence presented at trial showing that the Frozen Yogurt Business was unprofitable when Stark Enterprises operated at that location. In fact, Mr. Coven credibly testified that the Niles location was operating relatively normally prior to Plaintiffs transaction with Defendant-Debtor. Further, Defendant-Debtor used "the numbers" from the Stark-operated Niles location to show the Lowerys that it was profitable.

Moreover, the court finds this argument unavailing because Plaintiffs have established that they relied on Defendant-Debtor's portrayal of the Niles frozen yogurt store transaction as a good deal. Defendant-Debtor not only failed to inform Plaintiffs that a third-party (Stark Enterprises) has a security interest in assets that appear to have remained in Defendant-Debtor's name throughout the transaction, he lied to them in order to charge a premium for a store that he did not actually own at the time of the sale. Plaintiffs also considered Defendant-Debtor family. Thus, Plaintiffs were not on notice that they should consult with another attorney, review the documents reflecting the purchase from Stark Enterprises, investigate Defendant-Debtor's business history, or otherwise attempt to minimize the risk they were taking on when they entered into the Purchase Agreement/Joint Venture Agreement. In other words, Plaintiffs' reliance on Defendant-Debtor's status as an extended family member and his numerous misrepresentations/omissions played a primary role in causing Plaintiffs' as-of-yet undetermined damages.

Section 523(a)(2)(A) asks a broad question, namely whether the debtor received property as a result of fraudulent conduct, which can include, for example, a seller's knowing attempt to sell property that he does not in fact own. "Once it is established that specific money or property has been obtained by fraud…'any debt' arising therefrom is excepted from discharge." *Cohen*, 523 U.S. at 218, 118 S.Ct. at 1216. Given the voluminous amount of evidence in the record indicating that Defendant-Debtor conducted himself dishonestly throughout his engagement with Plaintiffs, and received over $95,000.00 from Plaintiffs as a result, the court finds that Plaintiffs' as-of-yet undetermined damages arising out of their engagement with Defendant-Debtor[15] are nondischargeable under §523(a)(2)(A).

## CONCLUSION

Plaintiffs' OBOPPA claim wades into waters not yet charted by Ohio courts, and Ohio's interest in delineating the contours of its franchise/business opportunity law strongly weighs in favor of allowing Ohio courts to do so in the first instance. Accordingly, the court will dismiss Plaintiffs' OBOPPA claim without prejudice.

---

15/ As stated by the United States Supreme Court in *Cohen*, "the phrase 'to the extent obtained by' in §523(a)(2)A)…does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." 523 U.S. at 218, 118 S.Ct. at 1216. Thus, "[t]he phrase makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt." *Id.* Accordingly, any debt that is proven to have arisen as a result of fraud under §523(a)(2)A) is excepted from discharge, including debts that arise from breach of contract claims that implicate fraud. *See*, *Id.*; *Hunter*, 535 B.R. at 218 (holding that proof of a breach of contract, alongside a demonstration of an intent to deceive, qualifies a debt as nondischargeble under §523(a)(2)(A)).

17

However, the facts presented at trial established that Defendant-Debtor committed fraud throughout the Niles frozen yogurt store transaction with Plaintiffs. Accordingly, the court finds that the undetermined debt Defendant-Debtor owes Plaintiffs in relation to the Niles frozen yogurt store transaction is nondischargeable under §523(a)(2)(A).

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Plaintiffs Torono Lowery and Niles Froyo, LLC's claim brought under the Ohio Business Opportunity Purchasers Protection Act be, and hereby is, **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the undetermined debt owed to Plaintiffs Torono Lowery and Niles Froyo, LLC by Defendant-Debtor Eno Iftiu is nondischargeable under §523(a)(2)(A). A separate judgment shall issue consistent with this memorandum.